# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**BRIAN ADDISON**,

       Plaintiff,

   v.

**CITY OF BAKER CITY,** *et al.*,

       Defendants.

Case No. 2:15-cv-2041-SI

**OPINION AND ORDER**

Clifford S. Davidson and Kristen G. Hilton, SUSSMAN SHANK LLP, 1000 S.W. Broadway, Suite 1400, Portland, OR 97205. Of Attorneys for Plaintiff.

Robert E. Franz, Jr., LAW OFFICE OF ROBERT E. FRANZ, JR., P.O. Box 62, Springfield, OR 97477. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

      Plaintiff Brian Addison ("Addison") brings this action against Wyn Lohner ("Lohner"), the Police Chief for the City of Baker City ("Baker City"), in his official and personal capacities, and Baker City, an Oregon municipality (collectively, "Defendants"). Addison asserts the following claims: (1) First Amendment retaliation under 42 U.S.C. § 1983 ("§ 1983"), against Lohner; (2) supervisory liability for First Amendment retaliation under § 1983, against Lohner; (3) municipal liability for First Amendment retaliation under § 1983, against Baker City;

(4) intentional interference with economic relations,[1] against Baker City and, in the alternative, against Lohner; (5) defamation, against Baker City and, in the alternative, against Lohner; (6) deprivation of federal procedural due process under § 1983, against both Defendants; and (7) deprivation of federal substantive due process under § 1983, against both Defendants. Before the Court are: (1) Defendants' motion for summary judgment against all claims asserted by Addison; and (2) Addison's cross motion for partial summary judgment against Defendants' Second, Third, Seventh, Tenth, Eighteenth, and Twentieth Affirmative Defenses. For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part, and Addison's motion for partial summary judgment is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

---

[1] Although Addison labels this claim "intentional interference with employment relationship," the Oregon Supreme Court and other courts have discussed intentional interference in the employment context using the elements for the tort of intentional interference with economic relations. *See, e.g.*, *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995); *Sims v. Software Sols. Unlimited, Inc.*, 148 Or. App. 358, 362 (1997); *Duke v. F.M.K. Constr. Servs., Inc.*, 739 F. Supp. 2d 1296, 1306 (D. Or. 2010).

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

From 2006 to 2008, Addison worked as a reporter at the *Record-Courier*, a newspaper in Baker City. On March 6, 2008, Addison wrote an editorial published in the *Record-Courier* titled "How About a Favorable Interpretation of the 4th Amendment." ECF 52-2 at 17. In this editorial, Addison commented on the "weakening" of the Fourth Amendment, particularly through the official use by the police of canine units. In the editorial, Addison wrote that the Baker City Police Canine Drug Enforcement Unit "patrolled" the Baker City High School gymnasium

during half time of a high school basketball tournament, in what Addison stated was a violation of the basketball game attendees' rights under the Fourth Amendment.

The Baker City Police Chief, Lohner, read the editorial and was upset that the community might think the Baker City Police Department ("BCPD") was using its new canine unit to violate people's constitutional rights. Lohner telephoned the publisher of the *Record-Courier*, Debbie Schoeningh, to express his displeasure with the editorial. Although the parties dispute whether Lohner demanded a meeting or Schoeningh suggested one, it is undisputed that after the editorial was published, Lohner met with Schoeningh and Addison. At this meeting, Lohner expressed his disagreement with the conclusion that the BCPD violated the Fourth Amendment. He also threatened to stop providing weekly articles to the newspaper and questioned the integrity of the newspaper for publishing the editorial.

On June 5, 2008, the *Record-Courier* fired Addison. At the time of his termination, Addison argued with Greg Brinton ("Brinton"), the owner of the *Record-Courier*. Addison also went to the workplace of Brinton's wife, Patricia Brinton, to discuss Addison's termination with her because she recently had been involved in a personnel decision at the newspaper involving Addison. Patricia Brinton was not in the office at the time of Addison's visit. Addison also tore a book that Schoeningh had given him, put it in a plastic bag, and hung it on the rearview mirror of Schoeningh's car. On June 6, 2008, Addison returned to the *Record-Courier* offices, perhaps to retrieve his final paycheck. The parties dispute Addison's demeanor on both June 5th and June 6th and whether he banged on the doors and raised his voice.

On June 6, the police were called. At the suggestion of Baker City Officer Wayne Chastain, that officer issued a stalking complaint against Addison. Officer Chastain also was the

police officer who had brought the canine unit to the high school gymnasium that was the subject of Addison's editorial on March 6, 2008.

On or about June 11, 2016, the state court held a hearing on the stalking complaint filed against Addison. Brinton testified that he did not feel threatened by Addison. Schoeningh testified that she did not have anything to add to Brinton's testimony. The state court judge dismissed the stalking complaint. Schoeningh later testified in her deposition that she did not recall hearing any threatening language from Addison.

When Lohner heard about the argument involving Addison at the *Record-Courier*, he instructed persons at police dispatch to "flag" Addison's name as a "caution." This resulted in a notation placed in Addison's "file" that he had "made threats" against Brinton and Schoeningh and challenged Brinton to a fight. From that point forward, whenever a police officer would run a check on Addison's name, the officer would see a warning that Addison has been "flag[ged] as caution," as well as those details. This caution was not removed after the state court dismissed the stalking complaint, nor was the fact that the stalking complaint had been dismissed added to the caution's details. The information continued to appear prominently and in more than one location in Addison's electronic record as of at least 2016, when his electronic file was retrieved, printed, and produced during this lawsuit.

When a caution appears on a person's name in the local law enforcement electronic file, a warning flashes "red" on the dispatch screen. According to Baker City's corporate designee at deposition, this warning is used if someone is "a threat, that could hurt a police officer who didn't know the history of the person." ECF 63-2 at 62-63. A review of the BCPD records of persons known to be violent towards police officers, however, shows that those persons were not generally flagged with a caution on their file.

Before the editorial was published, Addison had few interactions with the BCPD. After the editorial was published in March 2008, Addison had significantly increased personal contacts with the Baker City police. These included documented incidents on April 22, 2008, January 8, 2009, May 21, 2009, January 18, 2010, February 14, 2010, March 14, 2010, September 11, 2012, April 25, 2013, May 9, 2013, May 25, 2013, August 3, 2013, September 2, 2013, September 18, 2013, June 1, 2014, and June 7, 2014, most of which resulted only in "warning" tickets being issued to Addison. Addison testified that in addition to the contacts that were documented, there were more undocumented contacts that resulted in informal warnings.

In 2010, Addison left Baker City. He returned in 2012. On June 1, 2014, Addison had a contact with Baker City Police Officer (now Lieutenant) Dustin Newman. The parties dispute the details of that interaction. Lohner testified that at the time, Officer Newman reported that he "had a guy go completely off on me" at a traffic stop, and Officer Newman identified that "guy" as Addison. Newman also submitted a declaration, describing the traffic stop and stating that Addison was swearing and yelling, even though Newman had only given Addison a "warning" ticket. Addison testified that he did not lose his temper or yell at Newman during the traffic stop.

At the time when Officer Newman stopped Addison, Addison was working as a reporter for the *Baker County Press*. The publisher of that newspaper was Kerry McQuisten, who knows Lohner. On June 2, 2014, the day after the traffic stop, Lohner emailed McQuisten and asked her to meet with him so he could tell her about an "incident" that occurred. In an email on June 3, 2014, Lohner explained to McQuisten that the incident involved Addison being stopped by a police officer and "it didn't go well." Lohner testified in deposition that when he and McQuisten met, he described the traffic incident as it was reported to him by Officer Newman. Lohner stated

that he conveyed this information to Addison's private employer at the time because Lohner believed it was an issue of "community safety."

In August 2014, New Directions Behavioral Health and Wellness ("New Directions") hired Addison, who has a degree in psychology. On November 3, 2014, Addison gave an interview to the *Baker City Herald* about his work with New Directions, its "supported employment program" for its clients, and Addison's efforts to encourage participation by more employers. Addison also described a speech that he gave at a Baker City Council meeting. On November 10, 2014, the *Herald* published an article about New Directions based on Addison's interview.

Addison spoke with the *Herald* without anyone else present from New Directions. Addison believed that would not be a problem. Sheri Selander, the CEO of New Directions, however, believed that she had made it clear to Addison that she had to be present for the interview and believed that Addison was directly insubordinate by handling the interview alone. Selander wanted to read the article before deciding on how to handle Addison's insubordination. On November 12, 2014, two days after the article was published in the *Herald*, New Directions placed Addison on a 30-day work plan. Under the terms of this plan, there were supervisor meetings scheduled for each Monday, starting November 17, 2014. The plan also noted that:

> You [Addison] are a valued member of our Treatment Team and you bring many assets to our program. It is our belief that you are committed to this program and want to do the best job possible. Therefore, it is the intent of this Plan, to specifically state what is expected of you, so that you use it as a tool in order to improve your skills and remain within the scope of service you are to provide.

ECF 63-1 at 75. The plan further stated that it could be extended, as needed. At the time Addison was given the 30-day work plan, Addison was told that his employment would continue during the 30-day plan period, as long as Addison remained in compliance with the terms of the work

plan. Addison's supervisor testified that she does not recall that Addison did anything to violate the terms of his work plan before he was terminated two days later on November 14, 2014.

Lohner also saw the November 10, 2014 article and learned that Addison was working at New Directions. Lohner testified that he "had a concern for the vulnerable population that [Addison] would work with." Thus, after reading the article, at approximately 3:10 p.m. on November 12, Lohner sent an email to Marji Lind, the Clinical Director for New Directions. Lohner served on a mental health advisory board with Lind. Lohner's email stated: "I saw one of your recent hires and was curious if you do internal background investigations or if you hire them out?" ECF 49 at 26. On November 13, 2014, at approximately 7:34 a.m., Lind responded that New Directions obtains internal background checks, including Department of Homeland Security checks. She then asked: "[S]omething we should know???" *Id.* at 27. Lohner responded at approximately 7:50 a.m., "Give me a call . . ." ECF 52-2 at 33 (ellipses in original).

Telephone records show that Lind and Lohner spoke twice on November 13. The first call began at approximately 8:32 a.m., forty minutes after Lohner sent his email. That call lasted five minutes. The second call began at 1:39 p.m. and lasted seven minutes. Lohner and Lind gave conflicting testimony regarding the content of those two telephone calls, and Lohner testified that he does not even recall having the second conversation with Lind.

According to Lohner, he warned Lind that Addison had "mood swings" and described the "caution" that Lohner had placed in Addison's local law enforcement file. Lohner also informed Lind that Addison had an incident with a former employer that "did not go well." Lohner discussed with Lind Addison's volatile traffic stop with Officer Newman. Lohner admits, however, that he did not inform Lind that the state court had dismissed the stalking complaint that had been filed against Addison relating to the incident with the former employer Lohner had

described. Lohner also suggested to Lind that employers generally can do a "local records check" on a new hire to "see what types of contacts or what types of interactions" the new hire may have "had in the community specifically with the police or with the sheriff's office." ECF 53-1 at 34-37. Lohner states that he did not explicitly suggest that Lind look up Addison's local report.

Lind, on the other hand, testified that Addison's name never came up during her telephone conversations with Lohner on November 13. ECF 50 at 53. She testified that, in response to her conversation with Lohner, she contacted Karen Hendricks in the Human Resources department of New Directions. Lind said that she asked Hendricks about changing company policy generally in order to obtain local sheriff's office reports on all new hires. She adds that she discussed several employees with Hendricks and that "possibly" Addison's name came up in that context. ECF 63-1 at 58-59. Hendricks, however, testified that it was Selander, not Lind, who spoke with her on November 13 and that Selander instructed Hendricks to obtain a report about Addison from the local sheriff's office because "[t]here might be something of concern." ECF 63-1 at 20-21. At that time, there was no discussion about changing New Directions' policy to obtain these types of background reports on all new hires. *Id.* at 22. There also was no discussion about any other employee—the focus was solely on Addison. For purposes of deciding Defendants' motion for summary judgment, the Court views the facts in the light most favorable to Addison, and considers the recitation of these events as described by Lohner and Hendricks, and not as described by Lind.

On the morning after Lohner and Lind's telephone conversations, Hendricks obtained the local law enforcement file on Addison from Baker County Consolidated Dispatch ("BCCD"). ECF 52-2 at 35-41. This file included Addison's two-page "Fact File" and five-page "Incident

Report" relating to Addison's 2008 stalking complaint. The Court refers to the combined file as the "Seven-Page File."

The Fact File on Addison obtained by New Directions was missing information that local law enforcement "fact files" generated from BCCD generally contain, including that the police-issued stalking complaint was only valid for four days, through June 10, 2008. *Compare* ECF 49 at 15-16 (Addison's Fact File obtained by New Directions) *with* ECF 52-2 at 18-20 (Addison's Fact File obtained from BCCD by subpoena). It also did not contain information that the state court had long ago dismissed the stalking complaint. A few hours later, New Directions terminated Addison's employment.

BCCD acts as the records custodian for both the Baker County Sheriff's Office and the BCPD. Margaret Sackos at BCCD was in charge of records during the relevant period. She testified that a general "overview" fact file report from BCCD costs $10 and a detailed "incident" report, such as the Incident Report on the 2008 stalking complaint, requires a separate request and an additional $17 fee. When such files are requested, all fees are recorded in BCCD's receipt book.

The parties dispute whether BCPD was involved in providing Addison's Seven-Page File to New Directions. Hendricks testified that she paid only $10, but yet she received both Addison's overview Fact File and the Incident Report on the 2008 stalking complaint. *See* ECF 49 at 15-21. Additionally, Sackos testified that she and her co-worker, April Bower, are the only two employees at BCCD who provide fact files and incident reports and that neither of them provided Addison's Seven-Page File to anyone at New Directions. Sackos also testified that the format of Addison's Fact File that New Directions obtained was different from the format of fact files the BCCD generates and provides. Sackos also could not explain why certain information

was included on the Fact File that New Directions had, while other information was not included. In short, Sackos did not know where the Seven-Page File that New Directions received came from, but it did not appear to be from BCCD. In addition, the BCCD receipt book does not contain any record that New Directions—or anyone else for that matter—had requested Addison's Seven-Page File in November 2014. Moreover, an independent contractor who designed both the dispatch software and the templates used by BCCD to generate fact files, and other reports based on BCCD data, testified that it appears to him that the Seven-Page File obtained by New Directions was, in fact, generated at the BCPD, and not at the BCCD.

Lohner testified at deposition that he has concerns about Addison working with "vulnerable populations." Lohner also testified that he intends to continue to make similar calls to Addison's future employers. Lohner, however, could not recall ever making any calls to any other employer in a similar situation involving anyone other than Addison. Lohner added that he did recall a time when he contacted an employer after a forklift driver was pulled over for driving under the influence on his way to work, explaining that Lohner did not want a person under the influence operating a forklift.

## DISCUSSION

### A. Defendants' Motion For Summary Judgment

Defendants move against all seven claims asserted by Addison. The Court addresses each claim in turn.

#### 1. First Claim: First Amendment Retaliation, against Lohner

To prevail on his claim for First Amendment retaliation, Addison must prove that:

> (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal

relationship between the constitutionally protected activity and the
adverse action.

*Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016) (quotation marks omitted).

Defendants do not dispute that Addison engaged in constitutionally-protected activity,
nor do they appear to dispute at this stage that there is at least a genuine issue of material fact
regarding whether there is a causal relationship between Addison's protected speech and
Lohner's challenged conduct. Instead, Defendants argue that Addison was not subjected to
adverse action, as that term is used in the context of a claim of First Amendment retaliation. In
support of this conclusion, Defendants argue: (1) Lohner's conduct itself was protected speech
and is therefore subject to a "high bar" in order to be considered adverse action, and because
Lohner's activity was lawful, it does not meet that high bar; and (2) Addison was not deprived of
a *government* job or benefit. Defendants also argue that Lohner is protected under the doctrine of
qualified immunity.

### a. Adverse action

Defendants rely on *Mulligan* and an out-of-circuit case to argue that Lohner's actions
cannot constitute First Amendment retaliation. *Mulligan*, however, does not show that Addison's
claim is foreclosed as a matter of law. In *Mulligan*, the Ninth Circuit stated:

> Retaliation claims involving government speech warrant a cautious
> approach by courts. Restricting the ability of government
> decisionmakers to engage in speech risks interfering with their
> ability to effectively perform their duties. It also ignores the
> competing First Amendment rights of the officials themselves. . . .
>
> In accordance with these principles, we have set a high bar when
> analyzing whether speech by government officials is sufficiently
> adverse to give rise to a First Amendment retaliation claim.

*Mulligan*, 835 F.3d at 989.

*Mulligan* involved a plaintiff who had filed an administrative claim against certain police officers alleging that the officers had acted unlawfully. *Id.* at 986. In response, the police officers' union made public statements accusing the plaintiff of being a drug abuser and having acted aggressively against the officers. *Id.* As the Ninth Circuit explained, the issue in *Mulligan* was whether the First Amendment protection of citizens against government retaliation for speech "also requires those officials to remain silent *when accused of misconduct*, lest they risk liability for unlawful retaliation. We conclude that it does not." *Id.* (emphasis added). That is not the situation here.

The alleged retaliatory speech by Lohner in this case was not his public response to a claim by Addison of official misconduct. Instead, Lohner spoke privately with two of Addison's employers about Addison. Lohner states that his purpose for having those private conversations was based on his general concern for community safety. At his deposition, however, Lohner could not recall ever calling another employer under similar circumstances. The only other instance of calling an employer Lohner could recall was calling the employer of the forklift operator on the same day that the forklift operator was pulled over for driving an automobile under the influence while on his way to work. New Directions terminated Addison's employment shortly after Lind spoke with Lohner about Addison.

A reasonable inference from the facts in this case is that Lohner's objective in making private comments about Addison to his employers was to punish Addison for his past criticism of Defendants. In contrast, in *Mulligan* the defendants publicly responded to accusations against the police officers made by the plaintiff in a filed complaint. The loss of the plaintiff's job in *Mulligan* was only an incidental consequence of the media coverage of the entire dispute. Additionally, unlike Lohner in the present case, the defendants in *Mulligan* did not speak directly

to the plaintiff's employer. In *Mulligan*, the plaintiff's employer learned of the information only through media coverage of the public dispute. Thus, the facts of the pending case are quite different from the facts in *Mulligan*, and the issues here do not fall within the Ninth Circuit's response in *Mulligan* to the question of whether a government employee must remain silent when accused of official misconduct.

The question remains, however, whether First Amendment retaliation can ever be based upon the adverse consequence of a plaintiff's employment being terminated by a *private* employer. The Ninth Circuit noted in *Mulligan* that "[o]rdinarily, the adverse retaliatory actions complained of by plaintiffs are 'exercise[s] of governmental power that are regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his or her speech.'" *Id.* at 988 (emphasis added) (second alteration in original) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 544 (9th Cir. 2010)). Generally, a defendant must "make [a] decision or take [a] state action affecting [the plaintiff's] rights, benefits, relationship or status with the state" or the plaintiff must show "the loss of a valuable governmental benefit or privilege." *Id.* at 989 (quotation marks omitted). The Ninth Circuit clarified, however, that its precedents do not "stand for the proposition that speech by government officials can *never* give rise to a claim of First Amendment retaliation in the absence of a loss of tangible rights or government benefits." *Id.* at 989 n.5 (emphasis in original) (citing *Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003) and *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)).

In *Coszalter v. City of Salem*, the Ninth Circuit held that there is not "an exclusive, category-based limitation on the kind of retaliatory action that is actionable under the First Amendment," and that case does not allow the government "to take severe retaliatory actions— such as . . . engaging in campaigns of harassment and humiliation—because those actions do not

result in the loss of a valuable governmental benefit or privilege." 320 F.3d at 975-76. Indeed, the Ninth Circuit has recognized that "[i]nformal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment also." *White*, 227 F.3d at 1228 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

Viewing the facts in the light most favorable to Addison, Lohner called a representative of Addison's private employer, Lind, and discussed Addison's private and confidential information. Lohner warned Lind of Addison's "mood swings," described the "caution" flag that Lohner had placed in Addison's Fact File, informed Lind that Addison had an "incident" with a former employer, without mentioning that the stalking complaint had been dismissed by the state court, described Addison's purported "erratic" behavior during a traffic stop as relayed to Lohner from another police officer, and noted that there are records relating to local incidents at the sheriff's office. Although Lohner did not direct Lind to get the Seven-Page File on Addison, Lohner described that there was an interaction with Addison and his former employer that "did not go well," and Lohner informed Lind that there were records that she could get on this issue.

Lohner also discussed similarly private information with McQuisten, a representative from another of Addison's former employers. There also is evidence that the BCPD may have been involved in providing the Seven-Page File on Addison to his then-employer, New Directions, which contained allegedly misleading negative information about Addison. This evidence is sufficient to create genuine issues of material fact regarding (1) whether Lohner engaged in retaliatory conduct against Addison; and (2) whether a person of ordinary firmness would be chilled from continuing to engage in protected activity. In short, it is sufficient to create a jury question on the issue of adverse action.

### b. Causal connection

Although Defendants do not directly argue against there being sufficient evidence of a causal connection between Addison's protected speech and Lohner's alleged retaliation, Defendants indirectly make such an argument. Accordingly, the Court will address this element. Addison's alleged protected activity was the editorial that he wrote for the *Record-Courier* in 2008, criticizing Baker City's police department.[2] The alleged retaliatory conduct began shortly thereafter, but only conduct from October 29, 2013, is within the statute of limitations for this claim, and the primary retaliatory conduct alleged is Lohner's communications with Addison's private employers in June and November, 2014.

The Ninth Circuit has described three ways in which a plaintiff can show the requisite causal connection for First Amendment retaliation: (1) the proximity in time between the protected conduct and the retaliatory conduct; (2) expressed opposition by the alleged retaliatory actor; or (3) evidence that the proffered explanations are false and pretextual. *Coszalter*, 320 F.3d at 977. Addison has provided evidence of both expressed opposition and pretext.

Lohner went to the *Record-Courier's* office in 2008 after the editorial was published to express his opposition and demand a retraction. No retraction was given. Lohner remains offended by Addison's editorial. Thus, Lohner has expressed opposition to the 2008 editorial.

In addition, viewing the facts in the light most favorable to the non-moving party, Addison presents sufficient evidence to raise a genuine issue of material fact regarding whether Lohner's proffered explanation that his communications in 2014 with Addison's employers were

---

[2] In his response to Defendants' motion, Addison also discusses his interview with the *Baker City Herald* in November 2014. Addison's conduct in giving that interview is another instance of protected conduct, but Addison offers no evidence that Lohner's alleged retaliatory conduct was intended to chill Addison's 2014 speech. Instead, the story that appeared in November 2014 in the *Herald* merely serves as the explanation for how Lohner learned that Addison was working at New Directions.

motivated only by a concern for community safety is false or pretextual. Lohner contacted two of Addison's employers, one of which did not involve Addison working with "vulnerable" populations. Additionally, before the *Record-Courier* published Addison's editorial in 2008, Addison had minimal contact with the BCPD. After the editorial was published, however, Addison was pulled over in traffic stops numerous times and was issued numerous "warnings." Lohner also placed a caution flag on Addison's Fact File, purportedly because he was concerned for the safety of Schoeningh, even though both Brinton and Schoeningh testified that Addison did not threaten them. Lohner, however, did not place caution flags on the fact files of other persons known to him to be potentially violent toward police officers. Furthermore, Addison's caution flag was never updated after the stalking citation was dismissed, even though the BCPD knew that the stalking citation was valid for only four days. Addison also presented evidence that another person who had been convicted of harassing Lohner and had a no contact order in place to protect Lohner, had her record updated when that no contact order was lifted. Yet Addison's record was not similarly updated.

Lohner testified that he did not know that the stalking citation had been dismissed until this lawsuit. But viewing the facts in the light most favorable to Addison, such testimony may support a finding of pretext. The evidence shows that when Lohner decided to discuss the stalking incident with Addison's private employers six years after it occurred, knowing that police-issued stalking complaints are only valid for a few days, Lohner did not check on the disposition of the stalking complaint before disclosing its existence to ensure that he was not providing a "half-truth" or misleading information.

### c. Qualified immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" *Ziglar v. Abbasi*, --- U.S. ---, 2017 WL 2621317, at *23 (June 19, 2017) (citation omitted) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) and *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. The constitutional issue, however, need not be addressed first in every case. *Pearson*, 555 U.S. at 227. When considering whether qualified immunity applies, the court must resolve all factual disputes in favor of the party asserting the injury. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013).

### i. Constitutional right

As previously discussed, Addison has identified sufficient evidence to create a genuine issue of material fact as to whether he suffered an adverse action and whether there was a sufficient causal connection between his protected speech and the alleged adverse action.

Defendants do not dispute that Addison engaged in protected speech. Thus, a reasonable jury could find that Addison's First Amendment rights have been violated.

### ii. Clearly established

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Ziglar*, 2017 WL 2621317, at *24. To be clearly established, "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent. *Id.* (citations and quotation marks omitted). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (alteration in original). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins*, 710 F.3d at 1064 ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc) ("[T]he specific facts of previous cases need not be materially or fundamentally similar to the situation in question."))).

The First Amendment right of persons to be free from retaliation from police officers for speech is well established. "Police officers have been on notice at least since 1990 that it is

unlawful to use their authority to retaliate against individuals for their protected speech." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013). The fact that severe retaliatory conduct—such as harassment and humiliation or intimidation—and the loss of something other than a governmental right or benefit could support such a claim has been established at least since the Ninth Circuit's 2003 decision in *Coszalter*. Thus, Addison's First Amendment right to be free from retaliation for constitutionally protected speech was clearly established at the time of the alleged violation. Taking the facts in the light most favorable to the non-moving party, a reasonable fact-finder could conclude that Lohner violated Addison's clearly established constitutional right by taking adverse action against him in retaliation for Addison's constitutionally protected speech.

### d.  Conclusion

The Court denies Defendants' motion for summary judgment against Addison's claim for First Amendment retaliation. The Court further rejects Defendants' argument that Lohner is entitled to qualified immunity.

### 2.  Second Claim: Supervisory Liability, against Lohner

Supervisor liability under § 1983 changed after *Iqbal v. Twombly*. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1071-74 (9th Cir. 2012). Instead of a general test to determine whether the supervisor acted with deliberate indifference, courts must now look at the requisite mental state for the specific constitutional violation alleged. *Id.* at 1071-72. Where the supervisor acts directly, then there is specific intent, which generally suffices. *Id.* at 1073. For claims of speech violations under the First and Fourteenth Amendments, the Ninth Circuit has held that knowledge and acquiescence also suffices for supervisor liability. *Id.* at 1075.

Defendants argue that Addison's claim for supervisor liability under § 1983 must be dismissed because it is "undisputed" that at no time has Lohner ever directed any police officer

to stop Addison, harass Addison, or retaliate against Addison, or to provide any materials concerning Addison to New Directions. Defendants' use of the term "undisputed" is inaccurate. Addison disputes these contentions and offers evidence from which a reasonable jury could infer otherwise.

Addison's record with the Baker City Police shows that from 2004 to 2008 there were no traffic stops, warnings, or citations. After 2008 (when the editorial was published), there are many entries, and Addison testified that there were even more encounters with police after 2008 than those that are documented in his file. Addison also provides contradicting testimony describing his purported behavior during the June 2014 stop with Officer Newman, which is the traffic stop that Lohner described to Addison's employers. This is evidence from which a jury could infer that the BCPD began harassing Addison only after his 2008 editorial was published.

Additionally, Addison presents evidence relating to the Seven-Page File that was provided to his employer, New Directions, in November 2014. That evidence calls into question whether it originated from the BCPD, instead of the BCCD. The origination of this file, thus, presents a genuine dispute of material fact.

Regarding Lohner's involvement in this alleged pattern of harassment, it is Lohner who went to the newspaper offices expressing outrage at the editorial and questioning the integrity of the newspaper for publishing it, received at least two reports from his subordinates regarding interactions with Addison (the 2008 Chastain stalking citation and 2014 Newman traffic stop), put the "caution" flag on Addison's Fact File, never updated the caution flag, called two of Addison's employers to raise concerns regarding Addison, including discussing the 2008 stalking complaint without checking the disposition of the complaint, and has stated that he will continue to call Addison's future employers. A reasonable jury could infer from this evidence

that it is Lohner who is most disturbed with Addison and is engaging in behavior to get back at Addison. This is sufficient evidence to raise an issue of fact that Lohner was personally involved in alleged retaliation against Addison. It is also evidence that is sufficient to raise an issue of fact as to whether Lohner knew about the alleged retaliation by his subordinates and acquiesced in it. Although much of the conduct occurred outside of the statute of limitations period, and is therefore relevant only to motive, pattern and practice, background, or context, there is conduct within the statute of limitations supporting Addison's claims. That conduct includes Lohner's discussion with McQuisten, Lohner's discussions with Lind, some of the police encounters and warning tickets, Lohner's testimony that he will continue to call future employers, and the compilation and delivery of the Seven-Page File on Addison.

Defendants also argue that Lohner is subject to qualified immunity for this claim, for the same reasons discussed in connection with Addison's first claim. The Court rejects this argument for the same reasons it rejected Defendants' argument in Addison's first claim.

### 3. Third Claim: Municipal Liability, against Baker City

Against Addison's third claim, Defendants argue only that Baker City cannot be held liable for Lohner's First Amendment retaliation because Lohner is not liable. Defendants rely exclusively on their arguments challenging Addison's First Amendment retaliation claims brought against Lohner. Defendants offer no other argument why Baker City should not be liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because the Court denies Defendants' motions against Addison's First Amendment retaliation claims against Lohner, the Court denies Defendants' motion against Addison's third claim.

### 4. Fourth Claim: Intentional Interference with Economic Relations

Addison brings this claim in the alternative—Count One against Baker City, if Lohner was acting in the course and scope of his duties, and Count Two against Lohner personally, if he

was not. Baker City and Lohner admitted in their Answer to Plaintiff's Second Amended

Complaint that Lohner was acting at all material times in the course and scope of employment.

ECF 45 at 2 (¶ 3). Additionally, at oral argument the parties stipulated that Lohner was, at all

times relevant to this lawsuit, acting in the course and scope of his duties. In light of that

stipulation, Plaintiff agreed at oral argument that his alternative claim against Lohner personally,

Claim Four, Count Two, should be dismissed (although Plaintiff reserved his right to dispute

issues of immunity and privilege). Accordingly, Defendants' motion for summary judgment is

granted against Claim Four, Count Two, Addison's alternative claim against Lohner personally.

Under Oregon law, to prevail on a claim for intentional interference with economic

relations, a plaintiff must show:

> (1) the existence of a professional or business relationship (which
> could include, *e.g.*, a contract or a prospective economic
> advantage), (2) intentional interference with that relationship,
> (3) by a third party, (4) accomplished through improper means or
> for an improper purpose, (5) a causal effect between the
> interference and damage to the economic relationship, and
> (6) damages.

*McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).

Defendants do not specifically discuss the elements of this claim or argue that Addison

fails to raise a genuine issue of fact relating to any particular element. Instead, Defendants argue

that Count One of this claim must be dismissed because: (1) as a matter of law, Lohner did not

retaliate against Addison, citing *Mulligan*; (2) none of the statements made by Lohner were false

or defamatory and all are protected by the First Amendment; (3) telling someone there are public

records available about another person cannot, as a matter of law, amount to commission of the

tort of intentional interference with economic relations, *i.e.*, there was no improper means or

purpose; (4) nothing Lohner said caused the termination of Addison by New Directions because

New Directions terminated Addison for insubordination; and (5) the process to terminate

Addison by New Directions had already begun before Lohner spoke to Lind. Defendants also argue that Baker City (the only Defendant in this count) is immune from liability because Lohner's statements were discretionary in nature and made within the course and scope of his employment and that the statements were absolutely privileged under Oregon law.

### a. Defendants' Arguments Attacking the Merits

The Court has already rejected Defendants' argument that as a matter of law Lohner did not retaliate against Addison. The Court also, as discussed further in Section A.5 below discussing defamation, finds an issue of fact as to whether the City defamed Addison.

The Court also finds unavailing Defendants' conclusory statement, offered without any legal authority or other support, that telling a person that there are public records available about another person can never amount to intentional interference with economic relations. First, the evidence shows that Lohner did more than simply direct Lind to public records. Lohner discussed Addison's mood swings, relayed information about the "caution" flag that Lohner had placed on Addison's file, relayed hearsay concerning the asserted altercation between Addison and Officer Newman, and mentioned the incident regarding Addison's former employer without disclosing that the stalking complaint had been dismissed by the state court (thereby, arguably stating a "half-truth").

Moreover, there is some evidence calling into question the source of the "public records" file (*i.e.*, the Seven-Page File) that New Directions obtained and whether Lohner and the BCPD was involved in compiling or providing the Seven-Page File to New Directions. Additionally, New Directions had already performed a background check, including a Department of Homeland Security background check, on Addison and was satisfied. Without Lohner's involvement, it is unlikely that New Directions would have sought further background information on Addison. Defendants offer no authority for the proposition that it can never be

actionable under Oregon tort law for a police chief, with the intent to get a private employee fired in retaliation for that employee writing an editorial critical of the police department, to tell that employee's employer that the employee is essentially unstable and encourage the employer to obtain additional information regarding the employee.

Defendants' final two arguments challenging the merits of this claim are essentially the same—that New Directions did not terminate Addison's employment as a result of anything Lohner said, but instead for insubordination. The employees at New Directions testified that Addison's employment was terminated for insubordination. There is sufficient evidence, however, to raise an issue of fact on this point.

On November 12, 2014, Lohner was placed by New Directions on a 30-day work plan because of his purported insubordination in giving a newspaper interview without his supervisor being present. Under Addison's work plan, there were supervisor meetings scheduled for each Monday, starting November 17, 2014. Addison's supervisor testified that she did not remember Addison doing anything between November 12 and November 14 to violate the work plan. On November 13, 2014, however, Lind spoke to Lohner. The next morning, Hendricks obtained Addison's Seven-Page File. Hendricks and Selander reviewed that file before preparing Addison's termination paperwork later that day. From this evidence, a reasonable jury could conclude that it was Lohner's conversation with Lind and the information contained in Addison's Seven-Page File that was the real reason for New Direction's decision to terminate Addison's employment, not the insubordination for which, only two days earlier, Addison had been placed on a 30-day work plan but not terminated.

Moreover, termination is not required to establish a claim for intentional interference with economic relations. *See Lewis v. Oregon Beauty Supply Co.,* 302 Or. 616, 622-23 (1987)

("Discharge is not a necessary element of this tort. The salient inquiry in any interference claim is whether defendant's tortious conduct damaged plaintiff's economic or contractual relationship."). A reasonable jury could conclude that but for Lohner's interference, New Directions would not have altered its original plan to put Addison on a 30-day work plan to see if his purported insubordination improved, versus terminating Addison's employment on November 14.

### b. Governmental Immunity

Defendants argue that Baker City is immune from liability because Lohner's statements were made during the performance of a discretionary function and were made within the course and scope of Lohner's employment. Under the Oregon Tort Claims Act ("OTCA"):

> (6) Every public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for:
>
> (c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

Or. Rev. Stat. § 30.265(6)(c).

Defendants' argument is unavailing for two reasons. Baker City asserts that Lohner's statements were "discretionary in nature." The Court, however, finds that Lohner's statements were not made while performing a "discretionary function or duty," as that term is used in the OTCA. Accordingly, this immunity under the OTCA is not available to Baker City as a matter of law.

The Oregon Supreme Court has explained "discretionary function or duty" as follows:

> The legislature did not define the term "discretionary function or duty," and this court has struggled with the concept over the years. The result of that struggle, however, is an extensive body of case law refining the concepts. Briefly, the decision of a governmental official, employee, or body is entitled to discretionary immunity if

> a governmental person or entity made a policy choice among
> alternatives, with the authority to make that choice. Discretionary
> immunity does not apply, however, to "routine decisions made by
> employees in the course of their day-to-day activities, even though
> the decision involves a choice among two or more courses of
> action."

*Westfall v. Oregon Dep't of Corr.*, 355 Or. 144, 157 (2014) (citations omitted); *see also Turner v. State*, 359 Or. 644, 652 (2016) ("In a nutshell, government conduct amounts to performance of a 'discretionary function or duty' if it 'is the result of a choice among competing policy considerations, made at the appropriate level of government.'"); *McBride v. Magnuson*, 282 Or. 433, 436-37 (1978) (noting that "not every exercise of judgment and choice is the exercise of discretion" and that discretion involves "room for policy judgment" made by an official to whom responsibility has been delegated); *Timberlake v. Washington Cty.*, 228 Or. App. 607, 613 (2009) ("Thus, decisions entitled to immunity are those that involve the exercise of discretion in developing or implementing policy objectives through the assessment of costs and benefits, the evaluation of effectiveness of risks, and the choice among competing goals and priorities.").

Lohner did not make a *policy* choice among several alternatives. Such decisionmaking

> involves the delegated responsibility for "assessment and ranking
> of the policy objectives explicit or implicit in the statute" and for
> the judgment that one or more of these objectives will be served by
> a given action. In other words, insofar as an official action involves
> both the determination of facts and simple cause-and-effect
> relationships and also the assessment of costs and benefits, the
> evaluation of relative effectiveness and risks, and a choice among
> competing goals and priorities, an official has "discretion" to the
> extent that he has been delegated responsibility for the latter kind
> of value judgment.

*McBride*, 282 Or. at 437 (citation omitted). Instead, Lohner's decisions privately to speak with Addison's private employers are more similar to the types of decisions and actions by police officers and others that Oregon courts have found not to be discretionary—such as not to pursue a motorist, to place a person in protective custody, false arrest, false imprisonment, malicious

prosecution, and issuing an arrest warrant without the required sworn affidavit. *See id.* at 437-38 (gathering cases); *see also Lowrimore v. Dimmitt*, 310 Or. 291, 296 (1990).

The statements by Lohner are distinguishable from the statements by the defendant in *Munn v. Burks*, relied on by Defendants. 19 Or. App. 144 (1974). In *Munn*, the Lane County Sheriff met with the Lane County Board of Commissioners to provide input for the Commissioners' final recommendation regarding whether to renew the plaintiff's liquor license. *Id.* at 145. The plaintiff sued the Sheriff based on statements he made during that meeting. The Oregon Court of Appeals held that under Oregon's statutory scheme for liquor licenses, the actions by the Sheriff were discretionary and authorized. *Id.* at 145-46. The opinion is two paragraphs in length, concludes without further discussion that that Sheriff's conduct was discretionary, and contains no mention of the phrase "discretionary function or duty" or any analysis of its meaning.

Regardless of whether the Oregon Court of Appeals in *Munn* meant to analyze the Sheriff's actions under the rubric of a "discretionary function or duty" as that term is used in the OTCA, the decision by the sheriff in *Munn* is a policy decision, as such decisions have been explained by the Oregon Supreme Court in cases after *Munn*. The Sheriff had to consider the statutory requirements and policy objectives in allowing liquor licenses, how his comments regarding the plaintiff would affect whether the plaintiff's liquor license should be renewed, and how the plaintiff's renewed license or lack thereof would implicate those policies. Thus, the sheriff had to make a value judgment on what would be the cost and benefits to the community if the plaintiff's liquor license was renewed or not. The Sheriff making his recommendation to the County Commissioners, along with his reasons and knowledge about the plaintiff, was therefore a discretionary function. No such similar policy considerations, however, are present in this case.

Baker City, thus, fails to meet its burden of showing that this immunity under the OTCA applies in this case. *See Timberlake*, 228 Or. App. at 613-14 ("The burden is on the governmental defendant to establish its immunity.")

### c. Absolute Privilege

Defendants also assert that Lohner, as Chief of Police, is absolutely privileged to publish slanderous, false, and defamatory statements about another, as long as such publication is within the scope of his duties. Thus, argue Defendants, because Lohner has absolutely immunity for his allegedly defamatory statements, he is also immune from interfering with the economic relations of Addison by the allegedly improper means of defaming him.

The Oregon Supreme Court has held that an absolute privilege extends to "executive officers of government who maliciously publish defamatory statements in the course of their official duties."[3] *Shearer v. Lambert*, 274 Or. 449, 452 (1976). As noted, this privilege "is available to a defendant only if he publishes the defamatory matter in the performance of his official duties," which means he must be "required" or "authorized" to publish the defamatory material. *Id.* at 455. Lohner does not explain how he was "required" or even "authorized" to communicate with Addison's private employers regarding Addison. Accordingly, summary judgment is denied with respect to Defendants' assertion of absolute privilege.

### 5. Fifth Claim: Defamation

Addison also brings this claim in the alternative—against Baker City, if Lohner was acting in the course and scope of his duties, and against Lohner personally, if he was not. As

---

[3] Defendants argue that the privilege exists when official employees act "within the outer perimeter" of their "line of duty," citing to *Barr v. Matteo*, 360 U.S. 564, 575 (1959). *Barr*, however, involves the federal common law of privilege and not Oregon law of executive privilege. *Cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964) (mentioning *Barr's* privilege and noting that states' have a similar privilege even though "some differentiate" that privilege).

with Addison's intentional interference claim, because of the parties' stipulation at oral argument and Defendants' admission in their answer that Lohner was acting in the course and scope of employment, Defendants' motion for summary judgment against Addison's alternative claim, Claim Five, Count Two, against Lohner personally is granted.

In challenging the defamation claim against Baker City, Defendants make many of the same arguments and assertions that the Court has already rejected, including: (1) all of Lohner's statements were protected by the First Amendment pursuant to *Mulligan*; (2) Defendants are immune from state claims under Or. Rev. Stat. § 30.265(6)(c); (3) Lohner was absolutely privileged to make his statements; and (4) it is undisputed that the Seven-Page File was provided to New Directions by the BCCD and not by the BCPD. Defendants remaining arguments are that none of the statements made by Lohner were false and neither Lohner nor anyone else at the BCPD provided New Directions with Addison's Seven-Page File.

Lohner admits that he told Addison's employers about the information that Officer Newman purportedly told Lohner regarding the traffic stop that occurred. Addison, however, disputes Newman's version of the events. Thus, there is a factual dispute as to whether the information Lohner told Addison's employers was truthful. Additionally, Lohner admits that he told Addison's employers that Addison had "mood swings." This is information that would "tend to diminish the esteem, respect, goodwill or confidence in which [Addison] is held or to excite adverse, derogatory or unpleasant feelings or opinions against" Addison. *Neumann v. Liles*, 358 Or. 706, 711 (2016). Thus, it is information that can support a defamation claim, if false, and is information that Addison disputes. There are also inconsistent statements regarding what was said during the conversations between Lohner and Lind, and the quick and extreme reaction to those conversations supports an inference that something significant against Addison was said.

Moreover, Lohner discussed with Lind the fact that Addison had an altercation with a former employer and advised Lind that she could get more information from the "public records." Addison's Fact File, however, contained a line item showing the stalking complaint citation without noting that it was only valid for a few days, and there is evidence that the BCCD's version of Addison's Fact File contains a notation of the stalking citation's expiration date. Further, the Seven-Page File received by New Directions contained the stalking Incident Report, which is not typically included with a $10 overview fact file report purchase. Also, the BCCD does not have any receipt or other record showing that New Directions obtained Addison's Seven-Page File from them or ever paid to the BCCD the required fees. As previously discussed, there also is evidence calling into question the specific computer that originated the Seven-Page File that was provided to New Directions. This evidence, viewed in the light most favorable to Addison, raises an issue of fact regarding whether Lohner made defamatory statements regarding Addison and whether Lohner or someone else at the BCPD was involved in the preparation and delivery to New Directions of Addison's Seven-Page File. Accordingly, Defendants' motion against Addison's Defamation claim is denied.[4]

### 6. Sixth and Seventh Claims: Procedural and Substantive Due Process

In challenging these claims, Defendants recite, nearly verbatim, most of the same arguments the Court has previously rejected above in addressing Addison's defamation claim. Defendants' only new arguments are that Addison does not have a property interest in his at-will employment with New Directions (relating to Addison's procedural due process claim) and that

---

[4] The Court notes that Defendants' Twelfth Affirmative Defense asserts that Defendants' statements to New Directions are "conditionally privileged" and that Plaintiff has not moved against that defense.

Lohner's behavior did not "shock the conscience" (relating to Addison's substantive due process claim).

### a. Procedural due process

"The Due Process Clause forbids the governmental deprivation of substantive rights without constitutionally adequate procedure." *Shanks v. Dressel*, 540 F.3d 1082, 1090-01 (9th Cir. 2008). To prevail on a procedural due process claim, a plaintiff must establish: (1) a constitutionally protected liberty or property interest; (2) a deprivation of that interest by the government; and (3) the lack of adequate process. *Id.* at 1090.

Plaintiff alleges in his Sixth Claim for Relief that he had a property interest in his job with New Directions. Defendants argue that Addison did not have a property interest in his job with New Directions because he was an at-will employee. Addison responds that there is an issue of fact regarding whether New Directions modified his at-will employment through the 30-day work plan. Addison concedes that generally at-will employment does not give rise to a property interest, but relies on *Bennett v. Farmers Insurance Co.*, 332 Or. 138 (2001), for the proposition that a performance plan gives an at-will employee a property interest in his or her employment for the duration of the performance plan.[5] Addison, however, misreads *Bennett*.

The plaintiff in *Bennett* had an employment agreement that stated he was an at-will employee and could be terminated without cause. *Id.* at 142-43. In 1985, the plaintiff's supervisor expressed criticism to the plaintiff about his work performance. The employer then gave the plaintiff a letter setting out specific performance goals that the plaintiff was expected to

---

[5] Addison also relies on *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465 (9th Cir. 1991). That case, however, involved an employment contract that contained an at-will termination provision that required 90-days' notice if the employee was going to be terminated pursuant to it. *Id.* at 476. The Ninth Circuit held that such a clause created a property interest in 90 days of employment. No such provision is at issue here.

meet by the end of the year. *Id.* at 143. The letter indicated that failure to meet these goals would result either in the termination of the plaintiff's employment or a request for the plaintiff's resignation. *Id.* The plaintiff also had to submit ongoing detailed plans for how he would meet these stated goals. The parties referred to the plan as the plaintiff's "performance plan." *Id.* at 144. The plaintiff signed and returned the letter. The plaintiff did not quite reach his goals, but he was not terminated and was not asked to resign.

In 1992, the employer placed the plaintiff in *Bennett* on another performance plan. *Id.* One year later, the employer terminated the plaintiff's employment. *Id.* The plaintiff filed suit, asserting tort claims and a claim for breach of contract. The case went to trial, and other managers working for the employer testified that the 1985 performance plan was part of a strategy to get the plaintiff to resign, in part because some of the upper management's compensation was based on replacing managers at the plaintiff's level. *Id.* at 145. Several witnesses also testified that to terminate an employee at the plaintiff's level, good cause was required. *Id.* at 145-46. In addition, the plaintiff testified that several representatives of the employer had made it clear to the plaintiff that he would only be terminated for good cause.

The jury returned a verdict in favor of the plaintiff on each of his claims. *Id.* at 146. The trial judge granted the defendant's motion for judgment notwithstanding the verdict and, alternatively, for a new trial. *Id.* The Court of Appeals reversed the judgment notwithstanding the verdict on the contract claims, holding that there was sufficient evidence that the parties had modified the original at-will employment agreement. The Court of Appeals, however, affirmed the alternative order for a new trial based on an error in the jury instructions. *Id.*

The Oregon Supreme Court in *Bennett* considered the issue of whether there was sufficient evidence that the employer breached the contract by terminating the employment

without good cause. The employer argued that no good cause was needed because the agreement

specifically stated that the plaintiff's employment was "at will." The Supreme Court disagreed,

holding that

> the jury heard evidence not only of Winter's representations to
> plaintiff during the 1985 performance plan and of Farmers's stated
> company policy, but also of repeated, direct and indirect
> assurances to plaintiff that Farmers would not terminate the
> agreement absent good cause. In addition, the jury heard evidence
> that Farmer's managers falsely documented "good cause" grounds
> for plaintiff's termination, a fact that tended to establish that
> Farmers itself did not believe that it continued to have the right to
> rely on the at-will provision of the agreement.

*Id.* at 149. Although the 1985 performance plan was mentioned, it was only in the context of how

the plaintiff was in charge of his own destiny and how it was his own abilities and efforts that

would determine whether he retains his job. The plaintiff's 1985 performance plan was not even

in effect at the time of the plaintiff's termination. Moreover, the Oregon Supreme Court focused

on the repeated assurances by the employer that good cause would be required for termination

and on the "unwritten company policies like [the employer's] own stated policy not to terminate

employment agreements without good cause" *Id.* at 148. Therefore, it was not the existence of a

performance plan that was the dispositive factor that modified the at-will agreement in the

manner important for jury's conclusion that good cause was needed to terminate the plaintiff's

employment. Thus, *Bennett* does not support the proposition that a performance plan necessarily

creates a property interest (or even a genuine issue for trial) in an otherwise at-will employment

relationship.

Property interests, however, may be created in employment. Property interests are most

often discussed in the context of public employment, but the test is the same when the property

interest claimed is from private employment—an employee "must show that he had more than a

'unilateral expectation' of continued employment; he must demonstrate a 'legitimate claim of

entitlement.'" *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987) (applying the test in the context of private employment) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *see also Stiesberg v. State of California*, 80 F.3d 353, 356 (9th Cir. 1996) (applying the same test in the public employee context). Employees have a "property interest" in the terms and conditions of their employment if that interest is established "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577; *see also Merritt*, 827 F.2d at 1371. A reasonable expectation of entitlement is derived from the wording of the independent source of the entitlement, and the "extent to which the entitlement is couched in mandatory terms." *Stiesberg*, 80 F.3d at 356 (quoting *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994)). When the independent source of entitlement details procedural requirements, even those requirements do not automatically transform an employees' "unilateral expectation[s] into a protected property interest." *Wedges/Ledges*, 24 F.3d at 62. Such an interest is only created if the "procedural requirements are intended to be a significant substantive restriction on . . . decision making." *T.T. v. Bellevue Sch. Dist.*, 376 F. App'x. 769, 771 (9th Cir. 2010) (quoting *Stiesberg*, 80 F.3d at 356).

Accordingly, the Court looks at Addison's work plan to see if it provides a guarantee sufficient to give Addison "a reasonable expectation of entitlement" to remain at New Directions during the 30-day duration of the plan. *Stiesberg*, 80 F.3d at 356. The Court finds that the text of the work plan does not modify Addison's at-will employment and does not provide a reasonable basis for Addison to believe that he was guaranteed to remain employed by New Directions during the 30-day plan period.

In his declaration, however, Addison testifies that when he was given his 30-day work plan, he was told by New Directions that his employment would continue during the 30-day period, so long as he complied with the terms of the plan. It is unclear whether Addison is arguing that this oral representation was sufficient to create a property interest in his 30-day employment. If Addison intended to make such an argument, it is not persuasive. The oral representation that as long as Addison complied with his work plan he would be able to work for the full 30 days is not a sufficiently mandatory obligation that was a significant substantive restriction on New Directions' decision making such that it created a constitutionally-protected property interest in Addison having 30 days of employment. *Cf. Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 475 (9th Cir. 1991) (noting that although state law required specific procedures be followed before a bank president could be terminated and property interests can be created by reference to state law, the fact "that such an interest exists, however, is not to say that it is entitled to federal constitutional protection," and concluding that no constitutionally-protected property interest was created by the state law because "while state law may create an interest in having officials adhere to state procedures, those procedures alone do not give rise to a legitimate claim of entitlement that is subject to the protections of the federal due process clause"). Accordingly, Addison remained an at-will employee and thus did not have a property interest in his employment. Defendants' motion for summary judgment against Addison's procedural due process claim is granted.

### b. Substantive due process

The Supreme Court has held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v.*

*Connor*, 490 U.S. 386, 395 (1989)). Although the amendments constituting the Bill of Rights

apply to states only by virtue of their incorporation into the Fourteenth Amendment's Due

Process Clause, a claim that a state actor has violated such an amendment is brought under

§ 1983 without reference to due process. *See, e.g.*, *Anthoine v. N. Cent. Counties*

*Consortium*, 605 F.3d 740, 748 (9th Cir. 2010). Thus, Addison is considered to bring a claim

under the First Amendment, even though technically the application of the First Amendment to

Defendants operates through the Due Process Clause of the Fourteenth Amendment.

      "In this case, because the First Amendment explicitly covers [Addison's] claim, the First

Amendment, not the Fourteenth Amendment's guarantee of substantive due process, should

guide the analysis of [Addison's] claims." *Hufford v. McEnaney*, 249 F.3d 1142, 1151 (9th

Cir. 2001). Addison "cannot 'double up' constitutional claims." *Ramirez v. Butte-Silver Bow*

*Cty.*, 298 F.3d 1022, 1029 (9th Cir. 2002), *aff'd sub nom. Groh v. Ramirez*, 540 U.S. 551 (2004).

That is precisely what Addison seeks to do—his substantive due process claim is based on the

same conduct as is his First Amendment retaliation claim. Accordingly, Addison's substantive

due process claim is dismissed.[6] *See, e.g.*, *Hufford*, 249 F.3d at 1151 (finding that the First

---

      [6] Even if Addison's claim could be considered not duplicative of his First Amendment retaliation claim, the Court would still grant summary judgment. Not all substantive due process claims will be duplicative. *See Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."); *Webb v. Cty. of Trinity*, 734 F. Supp. 2d 1018, 1027 (E.D. Cal. 2010) ("Of course, an action may violate multiple constitutional prohibitions, and not every substantive due process claim will be duplicative."). Courts have considered that substantive due process claims might survive along with First Amendment claims when, for example, the alleged conduct is arbitrary and capricious but not retaliatory (which Addison does not allege or provide any evidence of), *see id.*, or because the alleged conduct implicates a different interest, *see Schneider v. Cty. of Sacramento*, 2014 WL 4187364, at *8 (E.D. Cal. Aug. 21, 2014). Neither situation is present here. But even if Addison's allegations supporting his substantive due process claim could be considered to involve different conduct or implicate a different interest, particularly the allegations relating to Lohner's threat to continue to call Addison's future employers (which is the only alleged conduct potentially not included in the First Amendment

Amendment retaliation claim preempted a substantive due process claim based on the same retaliatory discharge); *Buchanan v. Garza*, 2010 WL 2985075, at *4 & n. 3 (S.D. Cal. July 27, 2010) (declining to consider a substantive due process claim when the plaintiff based First Amendment access to courts and retaliation claims on the same behavior).

## B. Addison's Motion for Partial Summary Judgment

Addison moves against six of Defendants' 21 affirmative defenses. The Court considers the challenged defenses in two groups. First, the Court considers Defendants' "timeliness" defenses. Second, the Court considers Defendants' "First Amendment" defenses.

### 1. Timeliness Defenses

The challenged timeliness defenses are stated in Defendants' Second, Third, and Twentieth affirmative defenses. Defendants' Second Affirmative Defense asserts that claims based on acts before the two-year statute of limitations are barred where it applies. Defendants' Twentieth Affirmative Defense asserts that claims based on acts before the one-year statute of limitations are barred where it applies. Defendants do not specifically identify any claims or acts. Defendants' Third Affirmative Defense asserts that Addison did not provide timely notice under the OTCA for Addison's state law claims that are based on conduct occurring before 180 days before Defendants' receipt of Addison's tort claim notice.

---

retaliation claim), the Court finds that conduct does not rise to the level of the *most* egregious conduct that shocks the conscience and has no substantial relation to the public health, safety, or general welfare. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 and 847 n.8 (1998) (noting that "only the most egregious official conduct" establishes a substantive due process violation and that "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"); *Basso v. City of W. Covina*, 86 F.3d 1161 (9th Cir. 1996) (quoting *Lebbos v. Judges of the Superior Court, Santa Clara Cnty.*, 883 F.2d 810, 818 (9th Cir. 1989)) ("To state a substantive due process claim, the government's action must have been 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.'").

### a. Statute of limitations

Addison's remaining causes of action are three federal claims for relief based on First Amendment retaliation under § 1983 (Claims One through Three); one state law claim for relief for intentional interference with economic relations (Claim Four), and one state law claim for relief for defamation (Claim Five). The statute of limitations in a § 1983 suit is the same as provided under state law for tort claims alleging personal-injury. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). The relevant statute of limitations for personal injury claims under Oregon law is two years. Or. Rev. Stat. § 12.110(1). The statute of limitations for intentional interference with economic relations is also two years. *Id.* The statute of limitations for defamation is one year. Or. Rev. Stat. § 12.110(2).

Addison filed his Complaint in this action on October 29, 2015. For Addison's § 1983 and intentional interference claims, any claim for an act that occurred more than two years before the commencement of this action, or October 29, 2013, is barred under Oregon's two-year statute of limitations. For purposes of analyzing the statute of limitations on Addison's defamation claim, any act that occurred before October 29, 2014 is barred.[7] Defendants argue that any conduct occurring before the applicable statute of limitations is "irrelevant." Courts, however, have repeatedly explained that although time-barred acts are not themselves actionable, such acts may be used for other purposes, such as to establish motive; provide background; demonstrate

---

[7] Arguably, the discovery rule applies in the circumstances of this case because Lohner's discussions with Lind were confidential and Addison could not have known about them, even exercising reasonable diligence. *See White v. Gurnsey*, 48 Or. App. 931, 936 (1980) (holding that the discovery rule applies to defamation actions when the initial publication was confidential and not something that a plaintiff would be presumed to have known about, even exercising reasonable diligence). In January 2015, Addison discovered Lohner's allegedly wrongful disclosure when the investigator from the Oregon Bureau of Labor and Industries gave Addison the Seven-Page File that New Directions had obtained. Because Lohner's conversations with Lind are within the statute of limitations even without applying the discovery rule, the Court need not consider the discovery rule.

the required municipal policy, custom, or practice; or put any timely-filed claim in context. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062 (9th Cir. 2002) ("In assessing whether acts occurring within the limitations period are unconstitutional, we may look to pre-limitations period events as evidence of an unconstitutional motive."); *Anderson v. Reno*, 190 F.3d 930, 936 (9th Cir.1999) ("[E]ven if not actionable in and of themselves, untimely claims serve as relevant background evidence to put timely claims in context."); *Reyna v. City of Portland*, 2005 WL 708344, at *5 (D. Or. March 28, 2005) ("Thus, events before July 24, 2000, are time-barred for liability purposes, but may be relevant and admissible to establish the required municipal policy, custom, or practice element of plaintiff's § 1983 claim.").

The alleged conduct giving rise to Addison's claims of interference with economic relations and First Amendment retaliation included the conversations that Lohner had with McQuisten and Lind, the later allegedly harassing conduct by the BCPD, and the BCPD's purported involvement in preparing and providing Addison's Seven-Page File to New Directions. All of that conduct occurred after October 29, 2013. Thus, it is within the two-year statute of limitations period. Further, the alleged conduct supporting Addison's defamation claim are Lohner's conversations with Lind and the BCPD's purported involvement in gathering and providing Addison's Seven-Page File to New Directions, all of which took place in November 2014. Thus, this is within the one-year statute of limitations period for defamation claims.

There is earlier allegedly harassing conduct by the BCPD that Addison alleges took place before the respective limitation periods. These acts, however, provide context and are evidence of motive, lack of mistake, and a pattern and practice, and are permissible uses of time-barred

acts. Accordingly, Defendants' argument that these older acts are irrelevant is rejected.

Addison's motions against Defendants' Second and Twentieth Affirmative Defenses are granted.

### b. OTCA notice

Defendants allege that Addison did not timely provide notice under the OTCA for his state law claims for acts occurring more than 180 days before receipt of Addison's tort claim notice. Defendants assert that they received Addison's tort claim notice on April 13, 2015, and thus that any defamation and interference claims arising before October 15, 2014, are barred. Addison's defamation and intentional interference claims, however, are based on the alleged conduct involving Lind and New Directions, which occurred no earlier than November 2014. Thus, Addison's claims are not barred by the OTCA, Addison's motion against Defendants' Third Affirmative Defense is granted.

### 2. First Amendment Defenses

The challenged First Amendment defenses are Defendants' Seventh, Tenth, and Eighteenth affirmative defenses. Defendants' Seventh Affirmative Defense asserts that all of Lohner's alleged defamatory speech is protected under the First Amendment. Defendants' Tenth Affirmative Defense asserts that at the time of the statements allegedly made by Lohner, Addison was a "public figure." Defendants' Eighteenth Affirmative Defense asserts that Defendants' conduct is immunized under the *Noerr-Pennington*[8] doctrine. Each is addressed in turn.

---

[8] The Noerr-Pennington doctrine comes from *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

### a. Seventh Affirmative Defense

Defendants' Seventh Affirmative Defense asserts that Lohner's alleged defamatory speech is protected by the First Amendment. Where alleged defamatory speech involves a public figure or matters of public concern, it is entitled to special First Amendment protection. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964). Alleged defamatory speech that involves neither a public figure plaintiff nor speech involving matters of public concern, although "not totally unprotected by the First Amendment," is "speech of significantly less constitutional interest" and therefore is entitled to "less stringent" protection. *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 758, 760 (1985).

Addison moves for partial summary judgment against Defendants' Seventh Affirmative Defense. Because whether Addison is a public figure is the subject of Defendants' Tenth Affirmative Defense (discussed below), to determine whether Lohner's speech is entitled to heightened First Amendment protection with respect to Defendants' Seventh Affirmative Defense, the Court considers only whether Lohner's speech involved a matter of public concern.

In arguing that Lohner's speech did not involve a matter of public concern, Addison relies on *Neumann v. Liles*, 358 Or. 706 (2016). In *Neumann*, the Oregon Supreme Court analyzed whether statements posted on the internet reviewing a business establishment were defamatory. The Oregon Supreme Court noted that if false, the statements would be defamatory and because they were published, they were libelous and actionable *per se*, but nonetheless could be protected under the First Amendment. *Id.* at 720, 722. The Oregon Supreme Court noted that to resolve whether the statements were protected by the First Amendment "we must first determine, by examining the content, form, and context of Liles's statements, whether those statements involve matters of public concern." *Id.* (citing *Dun & Bradstreet*, 472 U.S. at 761).

The court next noted that it "must determine whether a reasonable factfinder could interpret Liles's statements as implying assertions of objective fact." *Id.* Defendants respond that Lohner's speech was on a matter of public concern because it implicated concerns of public safety.

The Court considers the content, form, and context of Lohner's communications with Lind. After reading the newspaper article and realizing that Addison was working at New Directions, Lohner emailed Lind, referencing one of New Directions "new hires" and asking about New Directions' background check process. When Lind responded by email, Lohner replied by asking her to call him. They soon had two telephone conversations with each other. There are differing accounts of what was discussed on these calls, but Lohner admits that he discussed: (1) Addison's mood swings; (2) the caution flag that Lohner had placed on Addison's Fact File; (3) the stalking incident; and (4) his suggestion that New Directions do a "local records check" on new hires to "see what types of contacts or what types of interactions" the new hires have "had in the community specifically with the police or with the sheriff's office." Shortly thereafter, New Directions received the Seven-Page File that arguably contains the incomplete and misleading information about Addison's stalking citation.

The Court is not persuaded that Lohner's private discussions with Lind constitute a communications on a matter of public concern or community safety. Rather, the Court finds persuasive *Cooper v. PGE*, 110 Or. App. 581 (1992). In that case, the plaintiff was employed by a subsidiary of PGE, which performed maintenance services at a nuclear power plant owned by PGE. *Id.* at 583. The plaintiff sued PGE for defamation after PGE reported to the plaintiff's employer that PGE had been informed that the plaintiff was a security risk, and the plaintiff was laid off from his job at the nuclear plant. *Id.* at 584-85. The Oregon Court of Appeals held that

although security at a nuclear power plant is an issue of public concern and safety, the communications at issue were not. The Oregon Court of Appeals stated:

> The statements were not published in a way that made them available to the general public and they were not a subject for public discussion or comment. They involved a purely private matter between private parties, and the possibility of liability for defamation poses "no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press. The facts of the present case are wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling."

*Id.* at 588 (quoting *Dun & Bradstreet*, 472 U.S. at 760).

The facts here are similar. Lohner did not publish his statements in a way that made them available to the general public and they were not subject to public discussion or comment. They were made during private conversations between Lohner and Lind, and defamatory liability would not threaten to chill free, robust, and public debate of issues of public concern. Accordingly, the Court finds that Lohner's speech did not involve a matter of public concern.

Defendants also argue that Lohner's statements do not need to be about matters of public concern for this affirmative defense to remain. Defendants support this argument by: (1) citing *Mulligan*, which involves a different legal concept; (2) relying on the immunity and privilege doctrines that do not involve the First Amendment and that the Court has already rejected; (3) arguing that regardless of its content, Lohner's speech is protected because Addison was a public figure, which the Court rejects below; and (4) arguing that even if the speech is not a matter of public concern, it is still has some measure of First Amendment protection. Whether there is some measure of First Amendment protection, however, is not an affirmative defense.

An affirmative defense is a defense in which the defendant introduces evidence, which, if found to be credible, will negate liability, even if it is proven that the defendant committed the

alleged acts. *See Roberge v. Hannah Marine Corp.*, 124 F.3d 199 (Table), 1997 WL 468330, at

*3 (6th Cir. Aug. 13, 1997) ("An affirmative defense . . . is a defense that does not negate the

elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the

plaintiff's claims are proven."); *Mathew Enter., Inc. v. Chrysler Grp. LLC*, --- F. Supp. 3d ---,

2017 WL 1408010, at *5 (N.D. Cal. Apr. 20, 2017) ("An affirmative defense is an assertion

raising new facts and arguments that, if true, will defeat plaintiff's claim, even if all allegations

in [the] complaint are true." (quotation marks omitted) (alteration in original)); *Cf. United States

v. Davenport*, 519 F.3d 940, 945 (9th Cir. 2008) ("Affirmative defenses are complete defenses

that, once proven by the defendant, negate criminal liability for an offense, notwithstanding the

government's ability otherwise to prove all elements of that offense beyond a reasonable

doubt."). Defendants' argument that there may be some "less stringent" First Amendment

protection of Lohner's speech does not *preclude* Defendants' liability, but, at most, involves the

standard of culpability Addison must prove at trial. These are issues more appropriately address

in pretrial motions or a motion for judgment as a matter of law. Addison's motion against

Defendants' Seventh Affirmative Defense is granted.

### b. Tenth Affirmative Defense

Defendants' Tenth Affirmative Defense asserts that Addison is a public figure, thereby

providing heightened First Amendment protection, and triggering a higher standard of culpability

that must be pleaded and proven for Addison's defamation claim than if Addison were not a

public figure. *See Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1289 (9th Cir. 2014) (noting

that only a negligence standard is required for private defamation actions whereas actual malice

is required for public figures to prevail in a defamation claim). Addison also moves against

Defendants' Tenth Affirmative Defense, which asserts that Addison was a public figure with

respect to the alleged defamation.

"Whether an individual is a public figure is a question of law that must be assessed through a totality of the circumstances." *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 888 (9th Cir. 2016). "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). "Even before the Supreme Court's public figure analysis, we observed that public figures for defamation purposes include, artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done." *Manzari*, 830 F.3d at 888 (quotation marks omitted).

At the time of Lohner's allegedly defamatory speech, Addison was a private citizen working at a mental health services non-profit agency. Addison had agreed to be interviewed by a local newspaper for a story discussing New Directions' mental health services in the community. "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society," an individual is not a public figure for all purposes. *Gertz*, 418 U.S. at 352. Thus, Addison was not a public figure for all purposes at the time of the alleged defamation in 2014.

Defendants also argue that Addison was an all purposes public figure because he wrote for a newspaper in 2007 and 2008, six years before the Defendants' alleged defamation. Defendants, however, offer no authority for the proposition that merely being a newspaper reporter six years before allegedly being defamed makes the reporter a public figure. The Court does not find Defendants' argument to be persuasive.

In considering whether Addison was a limited purpose public figure, the Court examines the "nature and extent of [his] participation in the particular controversy giving rise to the defamation." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013). For this inquiry, the Court considers "whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution." *Id.* The answer to all of these questions is no. Thus, Addison was not a limited purpose public figure with regard to Lohner's alleged defamatory statements.

Defendants argue, however, that Addison is a limited purpose public figure because he used his "power" as a reporter "wrongfully" to contend that the BCPD was conducting unconstitutional searches using canines, "knowing" that the police "could not respond" or refute these accusations. Thus, according to Defendants, Addison voluntarily "thrust" his views into the public arena. This argument has several errors. First, Addison "thrust" his views in the public arena six years before the alleged defamation. Second, and more significantly, Addison's views, expressed in his 2008 editorial, were on a completely different subject matter than Defendants' alleged defamation six years later. Limited purpose public figures are exactly that—public figures for a limited purpose. They must have voluntarily injected themselves into the controversy over which the alleged defamation relates. *See, e.g.*, *Lorain Journal Co. v. Milkovich*, 474 U.S. 953, 962 (1985) ("[A]n individual who voluntarily injects himself or is drawn into a particular public controversy becomes a public figure with respect to public discussion of that controversy." (quotation marks omitted)); *Makaeff*, 715 F.3d at 269 (noting that the "alleged defamation must be germane to the plaintiff's participation in the controversy").

Lohner's alleged defamation does not relate or respond to the issue of unconstitutional police searches. This is in contrast to the case cited by Defendants, *Knudsen v. Kansas Gas & Elec. Co.*, 248 Kan. 469, 470 (1991), in which the alleged defamation occurred at a meeting to discuss what the public utility believed were inaccurate facts and misleading statements published in an article written by the plaintiff. The only relevance of Addison's six-year-old editorial is that it allegedly provides the retaliatory motive for Lohner's actions and alleged malice. Addison's motion against Defendants' Tenth Affirmative Defense is granted.

### c. Eighteenth Affirmative Defense

The First Amendment to the U.S. Constitution guarantees the right "to petition the Government for a redress of grievances." U.S. Const. Amend. I, cl. 6. To make the Petition Clause meaningful, the Supreme Court, through the *Noerr-Pennington* doctrine, ensures persons are immune from antitrust or other statutory or tort liability "for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) (describing immunity from antitrust liability); *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) (applying doctrine to state law claims alleging tortious interference with prospective economic advantage).

Addison moves against Defendants' affirmative defense asserting that all of Defendants' conduct is protected under the *Noerr-Pennington* doctrine. Addison argues that Lohner was not petitioning government when he made his defamatory statements and interfered with Addison's employment. Defendants respond that "there is no doubt that New Directions was the equivalent of a government since it was providing Mental Health Services delegated to it by Baker County, when Baker County was otherwise required to provide the services." Defendants further respond that Addison's argument that Lohner was not "petitioning" New Directions is counter to

Addison's entire theory of the case, which is that Lohner was essentially pressuring New Directions to fire Addison.

The Court agrees with Addison that the conduct alleged is not protected under *Noerr-Pennington*. First, Defendants offer no evidence of the relationship between New Directions and Baker County, except the declaration of Lohner stating that in July 2014 New Directions was "granted the contract from Baker County to become the new Community Mental Health Program in Baker County." ECF 49 at 2. Lohner does not indicate that he has seen the contract or otherwise has personal knowledge of its contents. His declaration does not describe its contents. Lohner also does not describe the mental health services that Baker County is "required" to perform, how New Directions has been "delegated" to perform those services, or how he has personal knowledge of those facts. His declaration is insufficient to show that New Directions has stepped into the shoes of Baker County for purposes of providing mental health services.

Second, even if New Directions was performing certain governmental services and could be considered the equivalent of Baker County for some purposes, Defendants offer no legal authority that a private entity contracting to provide certain services for a governmental entity becomes the "equivalent" of the government for purposes of *Noerr-Pennington*. And factually, Lohner's conclusory characterization that New Directions has a contract to "become the new Community Mental Health Program in Baker County" is insufficient to show that New Directions is the "equivalent" of Baker County. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (noting that a non-moving party cannot defeat summary judgment "with unsupported conjecture or conclusory statements").

Third, even if New Directions is "government" or quasi-governmental for purposes of *Noerr-Pennington*, the Court concludes that Lohner was not petitioning New Directions for a

redress of grievances when he allegedly conveyed to New Directions the negative information about Addison. Although Lohner may have wanted, for retaliatory purposes, New Directions to terminate Addison's employment when Lohner conveyed the information about Addison, that is conduct not petitioning the government for a redress of grievances. The principles underlying *Noerr-Pennington* hold, in essence, that rights of association and petition shield from antitrust and tort liability attempts to persuade: (1) legislatures to adopt particular laws (*Noerr*); (2) the executive branch, including administrative agencies, to take or refrain from taking certain public enforcement actions (*Pennington*); and (3) courts to provide or deny redress (*Theme Promotions*). Under the facts of this case, Lohner's call to New Directions to convey negative information about Addison in hope that doing so may get Addison fired is not protected activity under *Noerr-Pennington*. Addison's motion against Defendants' Eighteenth Affirmative Defense is granted.

## CONCLUSION

Defendants' Motion for Summary Judgment (ECF 48) is GRANTED IN PART AND DENIED IN PART. Defendants' motion is granted with respect to Plaintiff's federal claims under Section 1983 that allege violations of procedural and substantive due process and Plaintiffs' state claims alleging personal liability against Defendant Lohner; Defendants' motion is denied with respect to all other claims alleged by Plaintiff. Further, Plaintiff's Motion for Partial Summary Judgment (ECF 51) is GRANTED. Defendants' Second, Third, Seventh, Tenth, Eighteenth, and Twentieth Affirmative Defenses are dismissed.

**IT IS SO ORDERED**.

DATED this 29th day of June, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge